IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

SARITA LEON,                     )
                                 )
            Plaintiff,           )
                                 )
    v.                           )    Case No.
                                 )    05-4415-CV-C-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,              )
                                 )
            Defendant.           )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sarita Leon seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ's finding that plaintiff does not have a severe impairment is not supported by substantial evidence, and (2) the ALJ improperly found plaintiff not credible. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On March 2, 2004, plaintiff applied for disability benefits alleging that she had been disabled since December

31, 1999.  Plaintiff's disability stems from degenerative disc disease at L5-S1; pain in her neck, legs, and hands; Hepatitis C; anxiety; and depression.  Plaintiff's application was denied on June 15, 2004.  On August 11, 2005, a hearing was held before an Administrative Law Judge.  On September 2, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On November 22, 2005, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

2

opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan,
876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also
take into consideration the weight of the evidence in the
record and apply a balancing test to evidence which is
contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th
Cir. 1998) (citing Steadman v. Securities & Exchange
Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.
It means such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."  Richardson v.
Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d
1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial
evidence standard presupposes a zone of choice within which
the decision makers can go either way, without interference
by the courts.  "[A]n administrative decision is not subject
to reversal merely because substantial evidence would have
supported an opposite decision."  Id.; Clarke v. Bowen, 843
F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the
burden of proving she is unable to return to past relevant
work by reason of a medically-determinable physical or

3

mental impairment which has lasted or can be expected to
last for a continuous period of not less than twelve months.
42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that
she is unable to return to past relevant work because of the
disability, the burden of persuasion shifts to the
Commissioner to establish that there is some other type of
substantial gainful activity in the national economy that
the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

     The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled.  These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

     1.  Is the claimant performing substantial gainful
activity?

                Yes = not disabled.
                No = go to next step.

4

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

            No = not disabled.
            Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

            Yes = disabled.
            No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff, her boy friend Greg Cravens, and her friend Miguel Cardenas, in addition to documentary evidence admitted at the hearing.

## A.  *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1976 through 2005:

5

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $    441.35 | 1991 | $2,610.57 |
| 1977 | 603.19 | 1992 | 1,942.61 |
| 1978 | 815.25 | 1993 | 756.65 |
| 1979 | 1,221.74 | 1994 | 1,192.08 |
| 1980 | 1,817.29 | 1995 | 2,577.39 |
| 1981 | 1,081.02 | 1996 | 2,119.35 |
| 1982 | 1,433.29 | 1997 | 4,520.11 |
| 1983 | 0.00 | 1998 | 1,470.88 |
| 1984 | 4,132.09 | 1999 | 708.49 |
| 1985 | 2,731.76 | 2000 | 0.00 |
| 1986 | 140.70 | 2001 | 0.00 |
| 1987 | 1,057.39 | 2002 | 0.00 |
| 1988 | 456.25 | 2003 | 0.00 |
| 1989 | 312.39 | 2004 | 4,306.02 |
| 1990 | 1,316.28 | 2005 | 0.00 |

(Tr. at 45).

During most of those years, plaintiff had multiple employers despite her low earnings:

| Year | Employer | Earnings |
|------|----------|----------|
| 1978 | Arkansas Waffles, Inc. | $   184.80 |
|      | Wendy's | 108.65 |
|      | Liquor-Mart | 121.90 |
|      | Stoneciphers, Inc. | 349.50 |
|      | Delta Construction Co. | 50.40 |
| 1979 | Chi-Chi's | $   321.76 |
|      | Taco Bueno Equipment Company | 54.41 |
|      | WG of America Holdings, Inc. | 845.57 |

6

| 1980 | Munro & Co.                        | $ 266.61   |
|------|------------------------------------|------------|
|      | Future Const. Co.                  | 35.20      |
|      | WG of America Holdings, Inc.       | 1,515.48   |
|      |                                    |            |
| 1981 | K Mart                             | $ 450.38   |
|      | Forrest Ballard Avanelle Rest.     | 274.70     |
|      | Monterey House Operating Co.       | 130.00     |
|      | Gallagher's Restaurants            | 62.18      |
|      | Sunbelt Hotels                     | 66.83      |
|      |                                    |            |
| 1982 | Magestic Hotel Co.                 | $ 635.98   |
|      | Forrest Ballard                    | 797.31     |
|      |                                    |            |
| 1983 | No earnings                        |            |
|      |                                    |            |
| 1984 | Jim Paws, Inc.                     | $2,912.01  |
|      | Caps Eatery & Pub                  | 829.79     |
|      | Beverly Health & Rehabilitation    | 390.29     |
|      |                                    |            |
| 1985 | TPI Restaurants                    | $ 98.83    |
|      | Arlington Hotel Company            | 938.45     |
|      | Jack N Jill, Inc.                  | 257.96     |
|      | Poncho Mexican Food                | 378.00     |
|      | Sheraton Hot Springs Lakeshore     | 1,058.52   |
|      |                                    |            |
| 1986 | Imperial Improvement Co.           | $ 140.70   |
|      |                                    |            |
| 1987 | Area Agency on Aging               | $ 13.05    |
|      | Painters Point Development Co.      | 1,044.34   |
|      |                                    |            |
| 1988 | TPI Restaurants, Inc.              | $ 36.01    |
|      | Rockys Corner                      | 420.24     |
|      |                                    |            |
| 1989 | Davis Oil Company                  | $ 302.34   |
|      | Arby's Roast Beef Restaurant       | 10.05      |
|      |                                    |            |
| 1990 | Vantage Healthcare Corp.           | $ 82.00    |
|      | Balke Restaurants                  | 72.46      |
|      | Pizza Hut                          | 342.61     |
|      | AMF Bowling Centers                | 53.00      |
|      | Crackerbox                         | 666.00     |
|      | Mr. Gattis LP                      | 100.21     |

Case 2:05-cv-04415-REL   Document 10   Filed 10/17/06   Page 7 of 59

| 1991 | Kroger Co. | $1,095.59 |
| | Turf Catering Company | 1,356.88 |
| | BL Littleton Ranch, Inc. | 158.10 |
| | | |
| 1992 | Turf Catering Company | $1,356.88 |
| | Heritage Company, Inc. | 108.63 |
| | Peopleworks of Arkansas | 136.00 |
| | Mona Lisa's Cajun Café | 39.35 |
| | Forest River Apartments | 301.75 |
| | | |
| 1993 | TPI Restaurants, Inc. | $ 420.73 |
| | Jim Paws, Inc. | 134.04 |
| | Angeles Real Estate Management Co. | 201.88 |
| | | |
| 1994 | Little Caesars Pizza | $ 436.38 |
| | Little Rock Groceries, Inc. | 112.88 |
| | Coach House Restaurant | 642.82 |
| | | |
| 1995 | Jim Paws, Inc. | $ 853.86 |
| | Harps Food Stores, Inc. | 511.77 |
| | McClards Bar-B-Q | 197.60 |
| | Dixie Restaurants, Inc. | 295.91 |
| | Rockys Corner, Inc. | 476.00 |
| | Quapaw Community Center | 242.55 |
| | | |
| 1996 | Chuck's Diner | $ 267.97 |
| | Agostinos Lakehouse Restaurant | 389.71 |
| | Arkansas Rehabilitation Services | 1,461.67 |
| | | |
| 1997 | TTC Illinois, Inc. | $ 458.27 |
| | TPI Petroleum, Inc. | 121.00 |
| | Welcome Smokers, Inc. | 277.75 |
| | Forest Hills Country Club | 2,766.57 |
| | Bones Thriftway | 99.72 |
| | Dinner Bell | 133.84 |
| | Arkansas Rehabilitation Services | 662.96 |
| | | |
| 1998 | TJX Companies, Inc. | $ 802.50 |
| | Midwest Hospitality Services | 554.05 |
| | Tyson Foods | 114.33 |
| | | |
| 1999 | Tyson Shared Services, Inc. | $ 708.49 |
| | | |
| 2000 | No earnings | |

8

| 2001 | No earnings | |
|------|-------------|--|
| 2002 | No earnings | |
| 2003 | No earnings | |
| 2004 | Wheel In | $ 636.00 |
| | Restaurant Company & Subsidiaries | 3,670.02 |

(Tr. at 46-56).

The employer from whom plaintiff earned the most income throughout her life was Restaurant Company & Subsidiaries, where she worked after her alleged onset date (Tr. at 56).

**Disability Report - Field Office**

On March 2, 2004, S. Oehrke of Disability Determinations had a face-to-face meeting with plaintiff (Tr. at 64-66). During that visit, S. Oehrke observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 65). Plaintiff did appear to be a little nervous (Tr. at 65).

**Disability Report**

In a Disability Report dated March 2, 2004, plaintiff reported that she is unable to work due to post traumatic stress disorder, Hepatitis C, depression, and adjustment disorder (Tr. at 67-72). She wrote that she cannot

concentrate, her thoughts go different directions, she has headaches, she is very tired, and she has flashbacks and back pain. Her condition first bothered her in 1999, and she last worked on December 31, 1999, leaving that job because she could not handle the stress (Tr. at 68).

**B.    *SUMMARY OF MEDICAL RECORDS***

On April 29, 1997, plaintiff was voluntarily admitted to the Levi Life Center under the care of Irving Kuo, M.D. (Tr. at 126-129). Portions of the admission report read as follows:

> PAST PSYCHIATRIC HISTORY: The patient relates that she was hospitalized at St. Joseph's Hospital by Dr. Lane five or six years ago after suicide attempt. She relates that he had given her a prescription for antidepressant medications, but she had gone to AA and wound up not filling the prescription because the people there told her she didn't need any medications.
>
> PAST MEDICAL HISTORY: The patient relates that she has had a history of gallbladder surgery. She denies any other medical problems. . . .
>
> SOCIAL HISTORY: . . . She, most recently, has been living with her mother. There is a history of alcoholism in the family as both mother and father have history of drinking. She has a brother who is a heroin addict, and she also states that her mother had several suicide attempts when the patient was much younger.
>
> MENTAL STATUS EXAMINATION: . . . Her long-term memory appeared to be in intact in terms of her ability to give a remote history. Short-term memory appeared to be intact as she was able to remember three out of three objects after five minutes.

10

REVIEW OF SYMPTOMS:  The patient relates that she has
had some headaches but without fevers or night sweats.
She has had some shortness of breath but states that
she smokes too much and smokes a pack of cigarettes a
day. . .

GENERAL IMPRESSION:  . . .  She relates that she drinks
in order to try to push all of the worries and
stressors that she has in her mind away.  In terms of
strengths, she is verbal and able to make her needs
known.  She is motivated for treatment and has had as a
seven month period of sobriety when she has gone to AA
meetings.

During plaintiff's admission, she reported that her

father had eight children by a previous marriage, and her

mother had four children by a previous marriage (Tr. at

138).  Plaintiff described her father as critical and not

affectionate, he lost his father and came to the United

States from Mexico when he was 11 years old (Tr. at 139).

Plaintiff said her father beat her with a belt, a knife, and

a fist; and that she had been physically abused by every man

she had been with (Tr. at 138).  She reported having been

raped at age 20 with five hours of beatings (Tr. at 138).

She had been drinking "a lot" for 25 years, she reported

using marijuana and smoking one pack of cigarettes per day

(Tr. at 139).

On April 30, 1997, a blood test showed that plaintiff

tested positive for amphetamine and marijuana, and another

illegible substance (Tr. at 168).  Her Alkaline Phosphate

11

[can indicate liver or bone disorders], AST/SGOT[1],

ALT/SGPT[2], GGTP[3], and LDH[4] were all high (Tr. at 171).

---

[1]Serum glutamic-oxaloacetic transaminase. An enzyme found in the liver, heart, and other tissues. A high level of SGOT released into the blood may be a sign of liver or heart damage, cancer, or other diseases. Also called aspartate transaminase.

[2]Serum glutamate pyruvate transaminase. An enzyme found in the liver and other tissues. A high level of SGPT released into the blood may be a sign of liver damage, cancer, or other diseases. Also called alanine transferase.

[3]Gamma-glutamyl transpeptidase. The GGT test helps to detect liver and bile duct injury. While some doctors use it in all people they suspect of having liver disease, others use it only to help explain the cause of other changes or if they suspect alcohol abuse. For example, both ALP and GGT are elevated in disease of the bile ducts and in some liver diseases, but only ALP will be elevated in bone disease. If the GGT level is normal in a person with a high ALP, the cause is most likely bone disease. GGT can also be used to screen for chronic alcohol abuse (it will be elevated in about 75% of chronic drinkers). Elevated GGT levels indicate that something is going on with the liver but not specifically what. In general, the higher the level the greater the "insult" to the liver. Elevated levels may be due to liver disease, but they may also be due to congestive heart failure, alcohol consumption, and use of many prescription and non-prescription drugs including nonsteroidal anti-inflammatory drugs, lipid-lowering drugs, antibiotics, histamine blockers (used to treat excess stomach acid production), antifungal agents, seizure control medications, antidepressants, and hormones such as testosterone.

[4]A blood test that measures the amount of lactate dehydrogenase (LDH), used to evaluate the presence of tissue damage.

On May 1, 1997, Dr. Kuo noted that plaintiff was doing better (Tr. at 164). "She is in a fairly good mood. She has been working hard in group therapy. She is really trying to take a look at her drinking and the problems surrounding that as well as the fact that she really has never been able to have any kind of successful relationship. She denies any side effects to the Prozac, and we will continue on the medications and observe."

On May 2, 1997, Dr. Kuo noted that plaintiff appeared to be doing well (Tr. at 166). "She is smiling and denies any suicidal ideation. She states that she is not depressed. She thinks the medications have been helping her. She realizes that she needs to work and needs to continue to go to AA meetings and maintain her sobriety. We will discharge her today. She will return for day treatment on Monday. She will continue Alcoholics Anonymous."

On May 2, 1997, plaintiff was discharged from Levi Life Center by Irving Kuo, M.D. (Tr. at 123-125). The discharge notes read in part as follows:

REASONS FOR HOSPITALIZATION: . . . [Plaintiff] presented on 04-29-97 via voluntary basis. She related that she had been having increasing symptoms of depression and had been suffering from alcohol abuse. She stated that she was at the Quapaw House approximately two weeks prior to admission and began drinking almost immediately upon being released. She

13

stated that she drank "as much as I can get" and that over the past several days had had an increase in suicidal ideation. She has had a history of three suicide attempts in the past via overdose and cutting herself. She stated that she did cut her wrist superficially approximately two days prior to admission. She felt extremely hopeless. She had just gotten out of an abusive relationship with a gentleman who beat her up. She stated that she had a history of being in abusive relationships. She related that she felt guilty about this as well as the fact that she has [a] 19-year-old son who was in prison and two younger children whom she had to give up custody to her sister because she was not able to take care of the children because of her drinking. She stated that she had problems with decreased sleep, decreased energy, decreased concentration as well as the increasing suicidal ideation. . .

SIGNIFICANT FINDINGS: . . . She was alert and cooperative. There was no evidence of psychomotor agitation or retardation. Her speech was of a normal volume, rate, and rhythm. Her mood was depressed, and her affect was constricted. Her thinking was goal directed and logical. There was no evidence of psychosis. There was no suicidal or homicidal ideation. Insight appeared to be fair. Judgment appeared to be poor. Cognitively, there appeared to be no gross deficits.

* * * * *

LABORATORY DATA: Revealed a normal thyroid function profile, a chemistry profile which showed increased liver function tests with a GGTP of 475, SGPT of 190, and SGOT of 81. . . . [S]he did have increased MCV[5] level of 99 probably secondary to her chronic alcohol intake.

---

[5]Mean Corpuscular Volume, a measure of the average red blood cell volume that is reported as part of a standard complete blood count.

14

HOSPITAL COURSE:  The patient was initially monitored for signs and symptoms of alcohol withdrawal and covered with Librium.  She also was started on Prozac at a dosage of 20 mg. PO [by mouth] q.d. [once a day] on 04-30-97.  She participated in group and individual activities, began to look better with each passing day. . Physically, she appeared to be going through symptoms of withdrawal fairly well taking Librium very judiciously.  She participated in group therapies looking at the history of abuse that she had gone through and also looking at the pattern of relationships that she had gotten herself into.  At the time of discharge, her condition appeared to be improved. Psychiatrically, she appeared to be less depressed.  Physically, her condition remained stable.

Plaintiff's alleged onset date is December 31, 1999; however, there are no medical records between plaintiff's discharge from Levi Life Center on May 2, 1997, and her next record dated February 13, 2004.

On February 13, 2004, plaintiff was discharged from Bothwell Regional Health Center (Tr. at 112).  Her admit status on February 12, 2004, had been depressed, but her discharge status was, "feels ready to go home and excited about AA".  The form states that plaintiff was able to perform all activities of daily living.

On February 20, 2004, plaintiff was seen at Pathways Community Behavioral Healthcare, Inc. (Tr. at 237-250).  She reported that she had been arrested five times, and had two arrests for DWI.  "Sarita has been hospitalized five times for medical problems.  She reports that chronic medical

problems (i.e., back injuries) interfere with her life and
that she does not take any prescription medication on a
regular basis for a physical problem.  Sarita receives no
physical disability pension.  No medical problems were
reported during the last 30 days.

"Based on Sarita's lack of self reported medical
problems during the last 30 days, her level of concern for
potential medical problems is considered to be minimal.
Nonetheless, she feels that treatment for medical problems
is moderately important.  However, the assessor's evaluation
of her need for treatment is somewhat lower.  Her need for
medical treatment was rated at 3 (the top of 'slight
problem, treatment probably not necessary')."

Plaintiff reported that her longest period of full time
employment was ten years.  "She has overdosed one time on
drugs.  Sarita has been treated for alcohol abuse 10 times,
four of which were for detox only.  Sarita has been treated
for drug abuse 10 times, four of which were for detox only.
In the last 30 days, Sarita has spent $200 on alcohol and
$360 on drugs. . . .  In the last 30 days Sarita has had
alcohol problems on 22 days.  Also, there were drug problems
on nine days of the last 30."  Plaintiff reported having
smoked cocaine nine times during the past 30 days, and said

16

she began using cocaine four years earlier.  She said she
had been charged with shoplifting once, prostitution four
times, and contempt of court once.  She had been charged
with disorderly conduct/public intoxication 30 times, DWI
twice, and major driving violations once.

The interviewer observed that plaintiff was not
obviously depressed or withdrawn; not obviously nervous or
anxious; had no problems with reality testing, thought
disorders, or paranoid thinking; was not obviously hostile;
was not currently threatening; was not having suicidal
thoughts; and had no trouble with comprehension,
concentration, or memory.  "Sarita reports being moderately
bothered by psychiatric problems in the last 30 days.  She
feels that treatment for psychiatric problems is moderately
important.  However, the assessor's evaluation of her need
for treatment is somewhat lower.  Her need for psychiatric
treatment was rated at 3 (the top of 'slight problem,
treatment probably not necessary')."

Plaintiff was assessed with alcohol and cocaine
dependence, and major depressive episode, and she was
assigned a GAF[6] score of 51 (moderate symptoms).  Plaintiff

---

[6]Global Assessment of Functioning.

reported that she had never had Hepatitis A, Hepatitis B, or
Hepatitis C.

On February 23, 2004, plaintiff had her blood drawn for
a multi chem 23 plus (Tr. at 114). Her AST and ALT (both
liver enzymes) were normal as was ALT (alkaline
phosphatase). Her GGTP [see footnote 3] was high.

On March 2, 2004, plaintiff filed her application for
disability benefits alleging an onset date of December 31,
1999.

On March 30, 2004, plaintiff saw Susan Burkhart, M.D.
(Tr. at 258). "Patient is a 42-year-old woman who has had
mental problems and has been depressed in the past with a
history of drug abuse with alcohol and drugs; not doing any
drugs or alcohol at this time. She comes in today feeling
quite good. She was hospitalized for depression and is now
on Lexapro and is doing quite well." Her review of symptoms
included plaintiff's allegation that a back injury in 2003
causes "some back pain". Plaintiff was able to bend over at
90 degrees. Straight-leg raising was negative. Liver
enzymes were normal. Chem 23 was essentially normal. Dr.
Burkhart assessed depression, back pain, and Hepatitis C.

18

She continued plaintiff on her Lexapro and told her she could use Darvocet[7] as needed for pain.

On May 24, 2004, plaintiff saw Frances Spickerman, Ph.D., a licensed psychologist, for a psychological consultation (Tr. at 116-118). Dr. Spickerman wrote in part as follows:

> IDENTIFYING DATA
> . . . [Plaintiff] presents for disability assessment based on posttraumatic stress disorder, Hepatitis C, depression, and adjustment disorder.
>
> MEDICAL HISTORY
> Applicant states that she was recently diagnosed with Hepatitis C. She says she has been hospitalized four times for depression, and has had three suicide attempts, once with a bottle of amitriptyline [an antidepressant], and twice by cutting her wrists. The most recent suicide attempt was ten years ago. She said emphatically that she has stopped doing this. She has been treated at Pathway's Counseling Center for alcohol and crack cocaine abuse, and is attending AA. She has been clean and sober for four months. . . . She has had seven drug and alcohol rehabs. She sees a counselor once a month. She was first diagnosed with depression ten years ago. . . . She has been taking Lexapro for four months, which is the longest time she has taken an antidepressant. She took Prozac, but did not take it long enough for it to be effective. Her longest period of sobriety was seven years. . . .
>
> EDUCATIONAL/OCCUPATIONAL HISTORY
> The applicant completed eighth grade, and discontinued when she became pregnant. She says she did well in school. Her longest job was for six months. She identifies her occupation as waitress. This was part

---

[7]Narcotic analgesic combined with Acetaminophen (Tylenol).

19

time.  She has had no job for two months.  She said she
was unable to concentrate, but that her boss did not
complain about her performance.  She tells me she has
lost many jobs because she was unable to concentrate.

RELATIONSHIP HISTORY
Ms. Leon is divorced, and has been married twice.  She
is the mother of three children, ages 17, 21 and 27.
She typically becomes involved with abusive men who
beat her. She is living with a boyfriend who she says
treats her okay.

DEVELOPMENTAL HISTORY
. . .  [Plaintiff] grew up in Arkansas, the only child
of . . . a chef and a registered nurse. . . .  She was
disciplined with a belt or switch, and kicked by both
parents, who also verbally abused her by cursing and
screaming.  She said that her parents "argued and
raised hell" most of the time.  She was raped at age
16.  Her parents died three years apart; her father
died from leukemia, and her mother from an MI
[myocardial infarction, or heart attack].

MENTAL STATUS EXAMINATION
Ms. Leon appeared on time for her appointment, and was
unaccompanied.  She is . . . casually and appropriately
dressed. . . .  She was pleasant and cooperative.  She
was alert and oriented to month, day and year, day of
the week, season, current President, previous
President, how long she has lived at her current
address, what time she got up, when she ate last, and
what she heard last in the news.  She was able to
repeat three of three items immediately, but none of
three after five minutes.  She was able to repeat six
digits forward, which is normal, but only three
backward (four is normal).  She made two mistakes
counting forward by three's, which is considered
failing the task.  Surprisingly, though, she was able
to do serial three's.  She got two of three mental
numerical calculation items correct:  knew that she
would have four dollars left from ten dollars if she
bought six dollars worth of gas, and knew that it would
take her eight hours to walk twenty-four miles at the
rate of three miles an hour.  She could not calculate
how many six-packs of pop she would need if she wanted

20

thirty cans.  She failed all three judgment items, saying that if she were lost in the forest in the daytime, she had no idea how she would find her way out; that she would exit if she were the first one in the movies to see smoke and fire; and that people pay taxes because the government makes them.  She got only one of three abstraction items correct:  knew that an orange and banana are both fruit, but said a dog and a rabbit both have four legs and that a truck and a bicycle both have wheels, which are poor quality responses.

Ms. Leon tells me that two to three times a week she has nightmares about her last boyfriend beating her. She has had occasional flashbacks.  She has had hallucinations only when coming off alcohol. She worries a lot about her children, her Hepatitis C, and her finances.  She says she is usually nervous.  Her affect is normal.  She is pleasant.  Psychomotor activity is normal; speech is normal in rhythm, rate and volume.  Mood appeared to be neutral. Affect was appropriate to what was being discussed.  She says she does not think about suicide now, but gets sad a lot, and feels sad most of the time.  She tosses and turns a lot trying to sleep.  She states that her appetite is good.  She feels helpless occasionally.  She feels guilt about not raising her own children, although she is close to them now.  She occasionally experiences derealization, depersonalization, and paranoia (more resembling social anxiety) occasionally.  She does not experience dissociation.

CURRENT ACTIVITIES
The applicant gets up and makes breakfast in the morning, cleans house for half an hour to an hour, then takes a break because she is very tired.  She complains of fatigue in general. She goes to an AA meting daily or reads her Big Book and prays; watches TV, reads a book 30-40 minutes.  Her boyfriend usually cooks.  She takes care of the money.  She tells me she has never had a driver's license: never took the test, just drove without a license.  Now she usually gets her transportation from the OATS bus.

21

SUMMARY CONCLUSIONS
[Plaintiff] presents with a history of depression and
multiple and alcohol drug rehabs, although she has
history of a seven-year period of sobriety.  She
appears to be pleasant and cooperative with neutral
mood, normal affect, normal psychomotor activity.
There is no crying or agitation or other apparent
symptoms of depression.  Her concentration and memory
today were somewhat impaired.  She is able to process
verbal information adequately.  I don't see any
impairments that are severe.

(Tr. at 116-118).

Dr. Spickerman found that plaintiff has no severe

limitation in daily activities; maintaining social

functioning; or concentration, persistence, or pace; and

that she has had no repeated episodes of deterioration in a

work-like setting (Tr. at 119).  She found that plaintiff is

capable of managing her own funds (Tr. at 119).  Plaintiff

can understand and remember instructions, she has a fair

ability to sustain concentration and persistence in tasks,

and she has a fair ability to interact socially and adapt to

her environment (Tr. at 119).

On June 10, 2004, Paul Stuve, Ph.D., a licensed

psychologist, completed a Psychiatric Review Technique (Tr.

at 175-188).  Dr. Stuve found that plaintiff did not have a

severe mental impairment.  He found that she had mild

limitations in activities of daily living; mild difficulties

in maintaining social functioning; mild difficulties in

22

maintaining concentration, persistence, or pace; and that there was insufficient evidence of repeated episodes of decompensation.

In support of his findings, Dr. Stuve wrote, "The claimant has a current diagnosis of Major Depression. The CE [consultative exam] examiner also diagnosed Alcohol and Cocaine Abuse in partial remission, but the evidence indicates that the claimant has been clean and sober for 4 months, and therefore is in 'early full remission' per DSM-IV diagnostic criteria. She is prescribed Lexapro for her depression.

"The claimant was hospitalized in 2/04, started on medications, improved and was discharged. A follow-up note from her treating physician in 3/04 indicates that she was 'feeling quite good' and 'doing quite well'. She was not using alcohol or drugs. At the current CE the claimant was alert and oriented, pleasant and cooperative, with sad mood but appropriate affect. Memory and concentration were somewhat deficient. The examiner noted that the claimant displayed 'no crying or agitation or other apparent symptoms of depression', and summarized that 'I don't see any impairments that are severe.'

23

"In her Claimant Questionnaire the claimant alleges Depression, PTSD [post traumatic stress disorder], and an Adjustment Disorder. She reports mood swings, flashbacks, and difficulty concentrating. She manages finances, does household chores, shops, prepares simple meals, and completes self-care tasks. Concentration and fatigue affect these activities somewhat. She reads and watches TV. She doesn't drive due to a DWI, but is away from home daily. She has difficulty understanding directions at times. She reports that others don't always understand her ways. There is no evidence of PTSD in the file, and no indication of mood swings or flashbacks. Other allegations are generally consistent with the MER and are considered credible. The evidence in the file indicates that the claimant's mental impairment is currently not severe."

On June 29, 2004, plaintiff saw Susan Burkhart, M.D., stating that she needed refills on Darvocet[8] and her sleeping pills (Tr. at 257). "She is here for a 3-month follow up. She has been taking Lexapro and her mood has improved. . . . Has chronic back pain from an old injury." Dr. Burkhart assessed depression, back pain, and Hepatitis

---

[8]Narcotic analgesic combined with Acetaminophen (Tylenol).

C.  She continued plaintiff on Lexapro and stated that she may use Darvocet as needed for pain.

On August 31, 2004, plaintiff saw Susan Burkhart, M.D., for chronic back pain (Tr. at 276).  She was given exercises and prescribed Darvocet.

On September 28, 2004, plaintiff saw Susan Burkhart, M.D., for a follow up (Tr. at 275).  "She is going to AA and has not had alcohol for 90 days.  She is working at Perkins as a waitress."  Dr. Burkhart assessed chronic back pain and recommended back x-rays and physical therapy.  She prescribed Darvocet, no more than four per day.

On October 28, 2004, plaintiff saw Susan Burkhart, M.D. (Tr. at 274).  "Sarita is a recovering alcoholic.  She hasn't had alcohol now in 4 months and is feeling quite good. She does have chronic back pain and is seeing physical therapy and it's helping quite a bit."  Dr. Burkhart prescribed Darvocet, no more than four daily, gave plaintiff 120, and told her to continue physical therapy.

On December 16, 2004, plaintiff saw Clinton Wallis, M.D., at the gastroenterology clinic (Tr. at 267-268).  "Ms. Leon is a 42-year-old . . . female with a history of Hepatitis C and history of alcohol abuse, abstinent since August 2004 who presents to GI Clinic for followup regarding

25

her Hepatitis C. She reports intermittent GERD symptoms, which she states is controlled with Zantac once a day. Otherwise, she denies complaints including fatigue. . ."

Her physical exam was unremarkable. "Liver function tests including AST, ALT, and total bilirubin were also within normal limits. The AST was 20, ALT 60, total bilirubin 0.4, and alkaline phosphatase 117." Dr. Wallis's impression and plan was as follows: "A 42-year-old Hispanic female who is Hepatitis C positive. Based on her normal liver function tests and low viral load, we will defer therapy at this time. If she appears to have worsening disease activity based on repeat laboratory data, we will consider biopsy and potential therapy at that time. I have asked Ms. Leon to follow up with me in GI Clinic in 12 months' time and call if she has further questions or concerns."

On January 14, 2005, plaintiff had lab work done at the request of Dr. Burkhart, and her ALT was slightly high at 45 (normal is 10-40) (Tr. at 262). She also had x-rays of her lumbar spine performed by David Roehrs, M.D. (Tr. at 266). Dr. Roehrs assessed marked degenerative changes at L5-S1, 10% compression superior endplate of L1 with degenerative changes, "likely older".

On January 19, 2005, plaintiff saw Susan Burkhart, M.D. for cough and sore throat (Tr. at 269). Dr. Burkhart recommended Sudafed, fluids, rest, and told plaintiff to decrease her smoking.

On February 18, 2005, plaintiff saw Frances McKee, RN, in Dr. Burkhart's office (Tr. at 273). Plaintiff was seen for a follow up on her upper respiratory infection. She reported having some crying spells, but they were mainly during the time she was ill and had "eased off now." Plaintiff requested appetite suppressants so she could lose weight. Plaintiff was instructed on a 1,200 to 1,500 calorie diet and portion control, was told to increase her exercise and water intake and cut down on caffeine and salt.

On March 8, 2005, plaintiff saw David Roehrs, M.D., for x-rays of her lumbar spine (Tr. at 265). Dr. Roehrs assessed severe degenerative changes, L5-S1, old compression of L1, "all unchanged from 1/14/05".

On March 29, 2005, plaintiff saw Susan Burkhart, M.D. (Tr. at 277). "She's been alcohol free for nine months, doing much, much better. She does have a low back problem, has severe degenerative joint disease mostly in the L5-S1 area. We would like to work this up to see if this is possibly surgically correctable. She also has a staph

27

infection on her face, looks like impetigo." Dr. Burkhart gave plaintiff 60 Darvocet. "She knows she can't take too many of those; she has a problem with that."

On March 31, 2005, plaintiff saw Rodney Hartman, M.D., for an MRI of her lower back (Tr. at 264). He assessed protruded disk at L5-S1 centrally, and compression at L1 "likely old".

On April 5, 2005, plaintiff saw Susan Burkhart, M.D., for a sore in the corner of her mouth (Tr. at 271). "I gave her Keflex and it is not responding very well. I am concerned as we have seen a lot of MRSA[9]. She is an alcoholic and we have seen it among these patients. I'll culture that." Dr. Burkhart also discussed plaintiff's MRI and suggested seeing an orthopedic, but plaintiff did not want to have any surgery. "I don't think we will do anything at this time." Plaintiff had a culture taken and it tested negative for staphylococcus (Tr. at 256).

_____

[9]Staphylococcus aureus is a bacterium often found in 20-30% of the noses of normal healthy people and is also commonly found on people's skin. Most strains of this bacterium are sensitive to many antibiotics and infections can be effectively treated. Staphylococcus aureus which are resistant to an antibiotic called methicillin are referred to as methicillin-resistant Staphylococcus aureus or MRSA. Many commonly prescribed antibiotics are not effective against these bacteria. Some MRSA strains occur in epidemics, indicated by an "E" before MRSA.

28

On April 14, 2005, plaintiff went to Bothwell Regional Health Center complaining of a staph infection (Tr. at 190-196).  Plaintiff was observed to be calm and cooperative, and mood and affect were normal.  She was asked whether she was afraid, whether she was being hit, and whether she was being hurt by anyone, and she answered "no" to all of those questions.  Plaintiff was given a Tetanus shot and was diagnosed with cellulitis (an infection of the skin).

On April 18, 2005, plaintiff saw Susan Burkhart, M.D., for a follow up on her facial rash (Tr. at 270).  Dr. Burkhart gave plaintiff a referral to a dermatologist and reminded her of the importance of "very, very good hand washing techniques, not sharing towels with anyone, and being aware of any cuts or anything on he hands and keep them away from her face."

On June 27, 2005, plaintiff went to the emergency room at Bothwell Regional Health Center and in triage said that she wanted help with alcohol (Tr. at 199-206).  She was observed to be calm and cooperative.  She was asked whether she was afraid, if she was being hit, and if anyone was hurting her, and she answered "no" to all of those questions.  Plaintiff had no musculoskeletal complaints. While being seen, plaintiff said "L5, S1 are hurt, I need a

shot." When asked about her request for help with alcohol, plaintiff said that she was given a choice by the police, either go to jail or go to the emergency room, so she chose the emergency room. Plaintiff had normal speech and gait. She denied any homicidal or suicidal ideations. In the treatment room, plaintiff complained that her back hurt, and she was questioned about alcohol and she denied any request for help with alcohol. Plaintiff's back pain was described as "mild". Her mood and affect were normal. Approximately one hour after her arrival in the emergency room, plaintiff left against medical advice, cursing and stating that she did not want any help. "Explained to patient that we treat chronic low back pain with no narcotics and patient said that is all I need to know."

On June 29, 2005, plaintiff was seen at Pathways Community Behavioral Healthcare, Inc., stated that she needed help with alcohol (Tr. at 234).

On July 13, 2005, plaintiff was seen for an initial psychiatric evaluation by Marsha Kempft, RN (Tr. at 281-282). Plaintiff reported that her mother killed herself five years earlier. Plaintiff said that she relapsed on July 2, 2005, and on July 24 she would have been sober for

30

one year.  Plaintiff's GAF was assessed "in the 50's (moderate symptoms)".

On July 14, 2005, plaintiff was seen at Pathways (Tr. at 208, 215-227).  She was assessed with alcohol dependence and assigned a GAF score of 51 (moderate symptoms).  Plaintiff reported 11 arrests, one DWI arrest, and four prior incidents of detox.  She reported having used alcohol in the past 30 days and smoking 1/2 pack of cigarettes per day during the past 30 days.  "She had a relapse with alcohol 2 weeks ago after 11 months sober.  Client reports that she has applied for disability, goes to court next month.  She has back injury, Hep. C and ADHD, PTSD, and depression.  She is currently on medication through Dr. Frick and Marsha Kemp of Otterville.  She reports that the medications are effective.  She reported her longest full-time job was four years.  She reported that she began using cocaine three years earlier, but had not used it during the previous 30 days.  She reported having been charged with disorderly conduct, vagrancy, or public intoxication 30 times; DWI one time; and major driving violation (reckless driving, speeding, no license, etc.) one time.  She spent one month in jail for driving while intoxicated.  She reported that her mother had an alcohol problem but her

father did not.  She was asked whether she ever experienced serious problems with her mother or father during her lifetime, and she answered "no".

On July 25, 2005, plaintiff was seen by Marsha Kempft, RN, in Psychiatric Services (Tr. at 280).  She reported that forgetting is her worst problem, she forgets what she is going to say, "forgets where she parks the car".  Plaintiff was continued on her medications (Lexapro and Trazodone).

On December 12, 2005, plaintiff was seen at Pathways (Tr. at 209-210).  One of the objectives in her treatment plan was exercise:  "Client will exercise physically a minimum of 30 minutes per day, 3 or more times per week."

**C.**  ***SUMMARY OF TESTIMONY***

Below is a summary of the hearing testimony which occurred on August 11, 2005.

**1.  Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 43 years of age and is currently 44 (Tr. at 298).  She lives in a one-bedroom apartment with her boy friend, Greg Cravens (Tr. at 298).  All of plaintiff's children are grown (Tr. at 298).

Plaintiff attended school through eighth grade (Tr. at 299).  Plaintiff was in special education classes, earned

32

C's, and her behavior was disruptive (Tr. at 299).

Plaintiff has no income, her boy friend who is retired takes
care of her (Tr. at 300).

Plaintiff worked at Perkins Restaurant about four hours
a day between the time she applied for benefits and the
hearing (Tr. at 301). Plaintiff was fired from that job
because she was in pain and could not perform anymore (Tr.
at 301). Plaintiff wore a back brace and complained a lot
about the pain she was in (Tr. at 302).

Plaintiff's back pain is at a nine or a ten all the
time (Tr. at 312-313). For relief, she uses a heating pad,
she lies down, and she takes medication which helps (Tr. at
313).

Plaintiff testified that she could stand for ten to 15
minutes at a time, she could sit for 15 to 20 minutes, and
her hands hurt "a little bit" (Tr. at 303). Plaintiff rode
in a car for 60 minutes to get to the hearing, and she made
it without stopping because she went to sleep (Tr. at 311).
Plaintiff cannot sit and do something with her hands because
her back bothers her and she gets nauseous and sick a lot
because of her Hepatitis (Tr. at 303). The Hepatitis also
causes her bones to hurt and she feels very tired all the
time (Tr. at 303). She is not supposed to work in

33

restaurants with Hepatitis, and her last employer did not know she had it (Tr. at 303). All of plaintiff's jobs have been in the restaurant industry (Tr. at 304).

Plaintiff goes grocery shopping with her boy friend but he carries the bags, he cooks, and he does the housework (Tr. at 310). She cannot lift a gallon of milk (Tr. at 310). Plaintiff was asked whether she had a driver's licenses:

Q.   Do you have a license?

A.   No.

Q.   How come?

A.   I just never went and got one.

Q.   Okay, were you, did you ever try to take the test?

A.   I did, I failed it.

Q.   The written test?

A.   Uh-huh.

Q.   So would they even let you in the car?

A.   No.

Q.   Okay.  Do you know why you failed the test?

A.   I couldn't understand it.

(Tr. at 310).

(I note here that plaintiff wrote in her disability application paperwork that her driver's license had been

suspended due to DWI (Tr. at 93), a fact which her friend Kerry Zerr confirmed.)

Plaintiff was taking Trazodone for sleep; Lexapro for depression; and Flexeril, a muscle relaxer, "for nerves" (Tr. at 304). Plaintiff had recently begun seeing a psychiatrist, Dr. Kim, who increased plaintiff's Lexapro (Tr. at 305). Dr. Kim thinks plaintiff has Attention Deficit Hyperactivity Disorder (Tr. at 306). Plaintiff's depression causes her to cry continuously (Tr. at 307). She estimated she has two or three crying spells per day (Tr. at 311). Plaintiff tried to kill herself three times previously (Tr. at 307).

Plaintiff has had problems with alcohol abuse in the past, and she goes to AA meetings (Tr. at 307-308). She has had some relapses, most recently in February 2005 when she sought treatment, and she also had a drink in July of 2005 (Tr. at 308). Plaintiff still feels depressed when she is not drinking (Tr. at 308).

**2.  Testimony of Greg Cravens.**

Mr. Cravens, a retired United States Postal worker, had known plaintiff for three or four years, and the two had been living together for about two years (Tr. at 315, 318). He does all of the household chores (Tr. at 315). Plaintiff

35

cries all the time (Tr. at 315). For example, he might say something to her the wrong way and she would start crying (Tr. at 315).

When plaintiff was working at Perkins, Mr. Cravens would observe her come home from work wearing her back brace and in a lot of pain (Tr. at 316).

Mr. Cravens does not keep alcohol in the home, and he drives plaintiff to AA meetings and to Pathways where she sees a psychiatrist (Tr. at 317).

### 3. Testimony of Miguel Cardenas.

Mr. Cardenas lives in Arizona but was plaintiff's boy friend for approximately 14 years (Tr. at 318). In the past year, he had seen her about six months of that time (Tr. at 318). Plaintiff has been suffering with pain since he met her, and her depression has been the same (Tr. at 318). He has observed plaintiff start crying for no reason (Tr. at 319).

### D. *THIRD PARTY STATEMENTS*

The following individuals provided third-party statements outside the hearing.

### 1. Kerry Zerr.

On March 13, 2004, Kerry Zerr, a friend of plaintiff's, completed a Functional Report - Third Party (Tr. at 81-89).

36

Ms. Zerr stated that she has known plaintiff for "one month" and sees her for one to two hours per day (Tr. at 81). She described plaintiff's daily activities as mostly staying at home, but recently having started a part-time job at a drive-in fast food restaurant (Tr. at 81).

When asked what plaintiff was able to do before her condition that she cannot do now, Ms. Zerr wrote that plaintiff was a waitress, now she has difficulty in social situations, and she has Hepatitis C complications (Tr. at 82). However, because Ms. Zerr had known plaintiff since February 2004 and plaintiff's alleged onset of disability was in 1999, Ms. Zerr had no basis for answering this question.

Ms. Zerr noted that plaintiff's impairment cases her to tire easily (Tr. at 82). She occasionally forgets clothing items when she is away from home (such as her coat). Ms. Zerr wrote that plaintiff does some cleaning and laundry, and that she does these for one to two hours (Tr. at 83). Plaintiff needs assistance with mopping and dishes because she gets disorganized.

Ms. Zerr stated that plaintiff goes out daily either walking, riding in a car, or using public transportation (Tr. at 84). She does not drive because her license was

37

suspended due to DUI (Tr. at 84). Plaintiff goes grocery shopping and she shops in stores to replace her missing clothes (Tr. at 84).

Ms. Zerr noted that plaintiff was able to live independently five years ago and handle her own money, but now her boy friend has to handle the money due to plaintiff's physical and mental problems (Tr. at 85). However, again, Ms. Zerr had only known plaintiff for one month, so she had no basis for comparing plaintiff's abilities from five years earlier.

Ms. Zerr had observed plaintiff attend 12-step meetings and occasional pot luck dinners at the community center and in social groups (Tr. at 85). She stated that plaintiff can pay attention for ten to 15 minutes (Tr. at 86). However, when asked whether plaintiff finishes what she starts, such as a conversation, chores, reading, or watching a movie, Ms. Zerr checked "yes" (Tr. at 86). She noted that plaintiff can follow directions fairly well when not fatigued.

**2.    Sarita Rodriguez.**

Plaintiff's daughter, Sarita Rodriguez, prepared an affidavit dated July 13, 2005, stating that she lives with plaintiff and sees her every day; her mother is always complaining about her back; her mother does very little

38

housework; her mother does not cook; her mother does not concentrate well and is forgetful due to mental problems; her mother is very emotional and depressed, and she cries a lot (Tr. at 105-106; 108-109).

## V.    FINDINGS OF THE ALJ

The ALJ found that plaintiff's insured status expired on June 30, 2001; therefore, to be entitled to a period of disability and disability insurance benefits under Title II, plaintiff must prove that she was disabled on or before that date (Tr. at 15).

At step one of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14). "Although the claimant alleges an onset date of disability of December 31, 1999, she had $4,306.02 in earnings for 2004, her second-best earnings year, and she worked about four hours a day at a restaurant until as recently as June 19, 2005.  However, the work after December 31, 1999 does not appear to constitute substantial gainful activity in terms of duration of employment or amounts of average monthly earnings" (Tr. at 14).

39

At step two of the sequential analysis, the ALJ found
that plaintiff does not have a severe impairment (Tr. at
17).

> The undersigned finds that the claimant has only slight
> abnormalities not significantly limiting the
> performance of any basic work activities. Therefore,
> she has no "severe" impairment or combination of
> impairments.

> The claimant has degenerative disc disease of the
> lumbosacral spine, but she does not have a herniated
> disc, as suggested by Dr. Burkhart. There is no
> medical evidence, even from Dr. Burkhart, about any
> musculoskeletal problems involving the neck, legs or
> hands. The claimant declined any surgical intervention
> for her back pain, and Dr. Burkhart even told her
> several times to exercise and to remain physically
> active, not idle. The claimant's Hepatitis, if she has
> that, is not active and produces no medically-
> established functional limitations. All of the other
> physical impairments mentioned in the medical records
> were minor or acute illnesses or injuries resulting in
> no significant long-term limitations or complications.

> . . . The medical evidence establishes no inabilities
> to ambulate effectively or to perform fine and gross
> movements effectively on a sustained basis due to any
> underlying musculoskeletal impairment. The claimant
> walked in and out of the hearing room without a cane,
> crutches, or other assistive device, and sat normally
> throughout the hearing, which lasted about 30 minutes.
> She moved her neck, shoulders, arms, hands, and fingers
> without noticeable difficulty.

> More critical is the issue of depression. The claimant
> alleges that it was this problem that eventually led to
> her being discharged from jobs because of inability to
> perform necessary job tasks, such as was the given
> reason for the termination of her restaurant job in
> June 2005. However, the claimant has never had steady
> treatment for this alleged problem either, and it never
> prevented her from working before, if one goes by her

40

earnings record, even though she claims to have had it
at a severe level for many years.  She characterizes it
as an adjustment disorder which, like the ADHD, seems
to be more of a self-diagnosis than anything else.  The
claimant has not been hospitalized for depression since
1997, even before her alleged onset date of disability,
and for the most part her depression was being treated
well with Lexapro, according to Dr. Burkhart.  She was
not significantly depressed when she saw Dr. Spickerman
in May 2004, and apparently did not have a relapse of
symptomatic depression, if it can be called that, until
June or July 2005.  Even if the depression is arguably
"severe" right now, there is no good reason, judging
from the claimant's history of mood disorder and its
previous response to treatment, to believe that the
current level of severity will last anywhere close to a
continuous period of twelve months or longer, as
required for a finding of disability under the Social
Security Act. Nurse Kemp apparently did not believe the
problem to be severe enough to require anything more
than routine outpatient monitoring at regular twice a
month intervals.

The claimant's basic abilities to think, understand,
communicate, concentrate, get along with other people,
and handle normal work stress have never been
significantly impaired on any documented long-term
basis.  There has been no documented serous
deterioration in her personal hygiene or habits, daily
activities or interests, effective intelligence,
reality contact, thought processes, memory, speech,
mood and affect, attention span, insight, judgment, or
behavior patterns over any extended period of time.
The claimant, except for some infrequent and short-term
occasions, has never been referred for formal treatment
to a psychiatrist, psychologist, or other mental health
professional.  At the hearing, she displayed no obvious
signs of depression, anxiety, memory loss, or other
mental disturbance. . . .

Because the claimant has no "severe" impairment or
combination of impairments, she is not disabled.

(Tr. at 17-19).

Case 2:05-cv-04415-REL   Document 10   Filed 10/17/06   Page 41 of 59

In making this finding at step two, the ALJ analyzed plaintiff's credibility and found that neither she nor her witnesses were credible (Tr. at 19).

The ALJ then jumped to step five of the sequential analysis and found that even if he were to find that plaintiff suffers from a severe impairment, she would still not be disabled because she retains the residual functional capacity to perform the full range of sedentary work (Tr. at 20).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62

42

F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956

F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly

discredits testimony and gives legally sufficient reasons

for doing so, the court will defer to the ALJ's judgment

unless it is not supported by substantial evidence on the

record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to

discredit plaintiff's subjective complaints is supported by

substantial evidence. Subjective complaints may not be

evaluated solely on the basis of objective medical evidence

or personal observations by the ALJ. In determining

credibility, consideration must be given to all relevant

factors, including plaintiff's prior work record and

observations by third parties and treating and examining

physicians relating to such matters as plaintiff's daily

activities; the duration, frequency, and intensity of the

symptoms; precipitating and aggravating factors; dosage,

effectiveness, and side effects of medication; and

functional restrictions. Polaski v. Heckler, 739 F.2d

1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p

encompasses the same factors as those enumerated in the

Polaski opinion.

43

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> Although the claimant alleges an onset date of disability of December 31, 1999, she had $4,306.02 in earnings for 2004, her second-best earnings year, and she worked about four hours a day at a restaurant until as recently as June 19, 2005. . . .
>
> The claimant had a very sparse work record, with no earnings showing after 1999 except for 2004 (2005 earnings are not yet available), and very minimal or mediocre earnings for other years.  Her highest earnings year was $4,520.11 in 1997.  This poor work record does nothing to enhance the claimant's credibility as a person who was ever well motivated to work outside of her home, even before allegedly disabling medical impairments set in.  For this and for the other reasons that follow, the undersigned finds the preponderance of the medical and other evidence to be inconsistent with the claimant's allegation of disability.
>
> . . . The claimant is somewhat obese, but her weight never approached the 266 pounds that would be needed to consider her for disability due to obesity for a woman of her height, 65 inches . . . .
>
> The claimant was hospitalized three days beginning April 29, 1997 for depression with suicidal ideation, and accompanying alcohol dependence.  However, there is no subsequently-dated medical evidence in the record until February 20, 2004, when the claimant sought outpatient treatment for substance abuse, mainly of alcohol and less so for cocaine.  She alleged a history of back pain at that time, but she was on no medication for any physical impairment.  She related a checkered employment history of short-term jobs, but had only a minimal concern for potential employability problems.  She said that she had a history of depression, but she felt good about entering the substance abuse treatment program. The claimant was seen by her primary treating

44

physician, Dr. Susan M. Burkhart, on March 30, 2004.
On that date, she felt quite good, and had not used
alcohol or drugs recently. Her depression and mood
were under good control with Lexapro. She said that she
had Hepatitis C, and that she was taking Darvocet for
"off and on" back pain, but her overall physical
examination that date, including musculoskeletal and
neurological signs, was unremarkable.

When the claimant was seen for a consultative
psychological examination by Frances A. Spickerman,
Ph.D., on or about May 24, 2004, she said that she had
been clean and sober for four months, and that her most
recent suicide attempt was ten years earlier. The
claimant's mental status was unremarkable, with no
evidence of crying spells. Dr. Spickerman said that
the claimant's memory and concentration appeared to be
somewhat impaired, but that her mental diagnoses, which
consisted of recurrent moderate major depression and
cocaine and alcohol abuse in partial remission, were
not severe.

Dr. Burkhart treated the claimant for a urinary tract
infection on June 29, 2004, not a long-term problem,
and at that time the claimant stated that her mood was
improving with Lexapro. She reported back pain on
August 31, and Dr. Burkhart prescribed medication and
told the claimant to exercise. The claimant was
working as a waitress as of September 28, and was still
alcohol and drug free. She has left epicondylitis, also
not a long-term problem, and Dr. Burkhart suggested
physical therapy for back pain. On October 28, the
claimant reported that the physical therapy was helping
her back pain. On December 16, 2004, she had some
gastric symptoms, but her Hepatitis C was not active
and there was no medical need to begin any course of
treatment for it.

* * * * *

No doctor who has treated or examined the claimant,
including Dr. Burkhart, has stated or implied that she
is disabled or totally incapacitated. No such doctor
has placed any specific long-term limitations on the
claimant's abilities to stand, sit, walk, bend, lift,

45

carry, or do other basic exertional activities.  The
claimant, despite alleging disability since the end of
1999, had no regular medical attention or treatment
before February 2004.  There is no evidence that she
has ever been refused medical treatment because of
inability to pay.  The undersigned infers that the
claimant did not get medical treatment more often
because she did not feel a medical need for it.

The claimant has had no surgery or inpatient
hospitalizations, at least not in recent years.  She
apparently had some physical therapy in the late part
of 2004 that she admitted helped her back pain.  She
was never referred to a pain management specialist.
She does not take strong doses of any pain or other
medication, and there is no documented record or
allegation of any adverse side effects from medications
the claimant does take.  Whatever adverse side effects
the claimant may have had at various times were
presumably all instances eliminated or at least greatly
diminished by simple changed in either the type of
medication or the size and/or frequencies of the
dosages. . . .

The medical evidence establishes no inability to
ambulate effectively or to perform fine and gross
movements effectively on a sustained basis due to any
underlying musculoskeletal impairment.  The claimant
walked in and out of the hearing room without a cane,
crutches, or other assistive device, and sat normally
throughout the hearing, which lasted about 30 minutes.
She moved her neck, shoulders, arms, hands, and fingers
without noticeable difficulty. . . .

The claimant's allegation of impairments, either singly
or in combination, producing symptoms and limitations
of sufficient severity to prevent the performance of
all sustained work activity is not credible.

(Tr. at 14-19).

46

## 1. PRIOR WORK RECORD

As the ALJ pointed out, plaintiff's prior work record establishes an almost complete motivation to work, even before her alleged onset date. Her highest annual earnings occurred in 1997, and was only $4,520. Her second highest annual earnings occurred in 2004 -- four years after her alleged onset date.

In addition to her low annual earnings, plaintiff has had only two years her entire life with only one employer throughout the year. Those years were 1986 when her annual earnings were $140.70, and in 1999 when her annual earnings were $708.49.

Plaintiff's earnings record establishes that many times she apparently worked only a couple of hours before leaving employment. For example, she earned a total of $50.40 from Delta Construction; $54.41 from Taco Bueno; a total of $35.20 from Future Const. Co.; a total of $62.18 from Gallagher's Restaurants; a total of $66.83 from Sunbelt Hotels; a total of $36.01 from TPI Restaurants; a total of $13.05 from Area Agency on Aging; a total of $10.05 from Arby's Roast Beef Restaurant; a total of $82.00 from Vantage Healthcare; a total of $72.46 from Balke Restaurants; a total of $53.00 from AM Bowling Centers; a total of $39.35

47

from Mona Lisa's Cajun Café; and a total of $99.72 from Bones Thriftway.

The employer from whom plaintiff earned the most money during her lifetime was the restaurant she worked for in 2004, after her alleged onset of disability. She earned $3,670.02 from that employer. Other than that job, the most plaintiff ever earned from an employer prior to her alleged onset date was $2,912.01 in 1984.

Plaintiff's prior work record clearly supports the ALJ's finding that plaintiff's subjective allegations of disability are not credible.

## 2. DAILY ACTIVITIES

In February 2004 when plaintiff was discharged from Bothwell Regional Health Center, it was noted that she was able to perform all activities of daily living. There is no evidence supporting plaintiff's allegation that her activities of daily living are limited due to her impairments.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Although plaintiff's alleged onset of disability is December 31, 1999, there are no medical records for the nearly seven-year-period from May 2, 1997, until February 13, 2004.

48

On February 20, 2004, an interviewer at Pathways Community Behavioral Healthcare observed that plaintiff was not obviously depressed or withdrawn; not obviously nervous or anxious; had no problems with reality testing, thought disorders, or paranoid thinking; was not obviously hostile; was not currently threatening; was not having suicidal thoughts; and had no trouble with comprehension, concentration, or memory.

In plaintiff's disability report completed on March 2, 2004, she did not allege back problems, although later in the form she mentioned back pain. However, she stated that she left her last job in 1999 due to an inability to handle stress, not due to any physical impairment.

In March 2004, Dr. Burkhart noted that plaintiff was not using any drugs or alcohol and was feeling "quite good".

In May 2004, Dr. Spickerman observed that plaintiff's affect was normal, she was pleasant, her psychomotor activity was normal, her speech was normal, her mood was neutral, and her affect was appropriate. Plaintiff did not cry, and there was no agitation or other apparent symptoms of depression. Although plaintiff's concentration was somewhat impaired, Dr. Spickerman found no severe mental impairment.

49

In June 2004, Dr. Stuve found no severe mental impairment.

In December 2004, plaintiff denied any fatigue when she saw gastroenterologist Clinton Wallis, M.D. Her liver function tests were all normal, and Dr. Wallis found no need for any treatment for Hepatitis.

In 2005, plaintiff was treated by Dr. Burkhart for back pain. Dr. Burkhart continued to give plaintiff Darvocet, a narcotic analgesic, despite noting that plaintiff had a problem with taking too many Darvocet (Tr. at 277). Plaintiff declined to see an orthopedic who may have recommended surgery. She also left a hospital after being told that she would get no narcotics for her back pain, saying "That's all I need to know." This evidence strongly suggests that plaintiff exaggerated her back pain in order to obtain prescription Darvocet.

In April 2005, plaintiff was observed to be calm and cooperative, her mood and affect were normal. She denied being hit, being hurt by anyone, or being afraid, which contradicts her claims of suffering from Post Traumatic Stress Disorder from her prior boy friend having beat her.

In June 2005, plaintiff again was noted to be calm and cooperative. She denied being afraid, being hit, or being

hurt by anyone.  She had no musculoskeletal complaints, which contradicts her claims of disabling back pain.  Later in this interview, plaintiff's back pain was described as "mild", and her mood and affect were normal.

The substantial evidence in the record does not support plaintiff's allegations of severe, frequent, and constant disabling symptoms.  This factor supports the ALJ's credibility finding.

**4.  *PRECIPITATING AND AGGRAVATING FACTORS***

Just about all of the evidence in the record suggests that plaintiff's use of alcohol and cocaine precipitates and aggravates her symptoms of depression. The record overwhelmingly establishes that when plaintiff is not using drugs and alcohol, her symptoms of depression are controlled with medication, she denied fatigue, and there was no evidence of physical or mental limitations.

**5.  *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

In May 1997, plaintiff told Dr. Kuo that she was not depressed and she believed her Prozac was helping her.  She denied any side effects from Prozac.  In March 2004, plaintiff was on Lexapro and was "doing quite well".  In June 2004, she told Dr. Burkhart that she had been taking Lexapro and her mood had improved.

In August 2004, Dr. Burkhart gave plaintiff exercises to do for her back pain.  The following month, she recommended physical therapy.  Plaintiff stated in October 2004 that she had not used alcohol in four months and was feeling quite good.  She also stated that the physical therapy was helping "quite a bit".

In July 2005, plaintiff told Pathways that her medications were effective.

All of the evidence in the record, aside from plaintiff's testimony, establishes that when she abstains from alcohol and drugs and takes her medication, her symptoms are entirely controlled.

*6.   FUNCTIONAL RESTRICTIONS*

In March 2004, S. Oehrke of Disability Determinations observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing.  Dr. Burkhart noted that plaintiff was able to bend over 90 degrees and straight leg raising was negative.

In February 2005 when she requested drugs to help her lose weight, she was told to exercise, cut down on calories, and reduce her food portions.

52

In December 2005, plaintiff was told to physically exercise for a minimum of 30 minutes per day, three or more times per week.

There is no evidence in the record that any of plaintiff's activities were ever restricted. In fact, the evidence on this factor establishes that plaintiff was consistently told to increase her activity.

**B.  *CREDIBILITY CONCLUSION***

In addition to all of the above factors which support the ALJ's credibility determination, I note that plaintiff's allegations have differed markedly from time to time with regard to extremely significant events in her life. For example, plaintiff told Dr. Kuo that both her mother and father had a history of drinking, yet she told Pathways in 2005 that her mother had a drinking problem but her father did not.

She told Dr. Kuo that her father beat her with a belt, a knife, and a fist; yet she told Pathways in 2005 that she had never experienced any serious problems with her mother or her father.

Plaintiff told Dr. Spickerman that her mother died from a heart attack, yet she told nurse Marsha Kempft that her mother committed suicide.

53

She told Dr. Kuo that she was raped at age 20; however, she told Dr. Spickerman that she was raped at age 16.

She told someone at Pathways in February 2004 that her longest period of full-time employment was ten years. She told Pathways in July 2004 that her longest full-time job was four years. She told Dr. Spickerman that her longest job was for six months. Her employment record clearly indicates that all of these statements are serious exaggerations.

Plaintiff told Dr. Spickerman that she never took a driver's test, she just drove without a license. She testified at the hearing that she did take a driving test but failed it. And in her disability application paperwork, plaintiff reported that her driver's license had been suspended due to DWI (and one has to have a license before it can be suspended).

In addition, plaintiff's use of cocaine began, according to her admissions to medical professionals, the same time as her alleged onset date. In June 2004, plaintiff went to the emergency room only because she was given a choice by the police of going to the hospital or going to jail.

54

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's credibility determination both in considering the _Polaski_ factors and in considering the significant misrepresentations made by plaintiff through the past few years. Therefore, plaintiff's motion for judgment on this basis will be denied.

**VII. _SEVERE IMPAIRMENT_**

Next plaintiff argues that the ALJ erred in finding that plaintiff's impairment is not severe.

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

>> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

>> (2)  Capacities for seeing, hearing, and speaking;

>> (3)  Understanding, carrying out, and remembering simple instructions;

>> (4)  Use of judgment;

Case 2:05-cv-04415-REL   Document 10   Filed 10/17/06   Page 55 of 59

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited.

In March 2004, S. Oehrke of Disability Determinations observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing.

When plaintiff was admitted to Levi Life Center in 1997, she reported problems with decreased concentration. However, once she went through alcohol withdrawal, Dr. Kuo noted that she was alert and cooperative, there was no evidence of psychomotor agitation or retardation, her speech was normal, her thinking was goal directed and logical, there was no evidence of psychosis, suicidal ideation or homicidal ideation.

In March 2004, Dr. Burkhart noted that plaintiff was not using alcohol or drugs and felt quite good, was doing quite well. Her liver enzymes were normal, blood tests were normal, she could bend over at 90 degrees, and straight leg raising was negative.

In March 2004, Dr. Spickerman noted that plaintiff was pleasant and cooperative. This was a time when she was not using alcohol or drugs. Dr. Spickerman found that plaintiff's concentration and memory were "somewhat" impaired, but not enough to constitute a severe mental impairment. Dr. Spickerman found that plaintiff had no severe limitations in daily activities; maintaining social functioning; or concentration, persistence, or pace; and that she has had no repeated episodes of deterioration in a work-like setting. She found that plaintiff could understand and remember instructions, she had a fair ability to sustain concentration and persistence in tasks, and she had a fair ability to interact socially and adapt to her environment.

In June 2004, Dr. Stuve found that plaintiff did not have a severe mental impairment. He found that she had mild limitations in activities of daily living; mild difficulties in maintaining social functioning; and mild limitations in maintaining concentration, persistence, or pace. He noted there was no evidence of post traumatic stress disorder in the file, and no indication of mood swings or flashbacks.

In October 2004, Dr. Burkhart noted that plaintiff had not had alcohol in four months and was "feeling quite good."

In December 2004, plaintiff's liver function tests were within normal limits, and she was not using alcohol at this time. Her gastroenterologist felt no need to treat plaintiff in any way for her Hepatitis.

In March 2005, Dr. Burkhart noted that plaintiff had been alcohol-free for nine months and was "doing much, much better."

As mentioned above, plaintiff's alleged onset date is December 31, 1999; however, plaintiff did not see a doctor for almost three years before that date and for over four years after that date. Her alleged onset date also coincides with her onset of cocaine use.

There simply is no evidence in the record establishing that plaintiff's basic work activities are limited at all. Therefore, plaintiff's motion judgment on the ground that the ALJ erred in finding that plaintiff does not suffer from a severe impairment will be denied.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Her insured status expired on June 30, 2001 -- a time right in the middle of a seven-year period when plaintiff sought no medical treatment for

58

any impairment. Therefore, she cannot establish a right to benefits under Title II. The substantial evidence in the record as a whole establishes that plaintiff does not suffer from a severe impairment. Therefore, she has not established a right to benefits under Title XVI.

Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 17, 2006

59